IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
PLANO DIVISION

| | | |
|---|---|---|
| VANTAGE PRODUCTION, L.L.C., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:14-cv-00546 |
| | § | |
| OPTIMAL BLUE, L.L.C., | § | |
| | § | |
| Defendant. | § | |

## ORIGINAL COMPLAINT

COMES NOW Plaintiff, Vantage Production, L.L.C. ("Vantage"), and files its Original Complaint for violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, against Defendant Optimal Blue, L.L.C. ("Optimal Blue").

## I.  INTRODUCTION

1.      This action arises from the anticompetitive conduct of Optimal Blue, L.L.C. ("Optimal Blue") in both the mortgage related product pricing engine market ("PPE-Mortgage market") and the integrated mortgage related customer relationship management market ("Integrated CRM-mortgage market").  Optimal Blue is now charging supracompetitive prices for services it at one time offered for no cost.  Through acquisition and business acumen, it was able to garner significant market share, in excess of 60%, and has been able to establish itself as the market leader in the PPE-Mortgage market.  Because over 60% of lenders who use PPE services rely on Optimal Blue, the result is that companies in the Integrated CRM-Mortgage market have to integrate with Optimal Blue in order to gain and retain customers.  Optimal Blue is now using its monopoly power in the

**ORIGINAL COMPLAINT – Page 1**

PPE-Mortgage market improperly to leverage into a monopoly position in the Integrated CRM-Mortgage market.

2.      From approximately August 2013 until May 2014, with Optimal Blue's knowledge, Vantage marketed to prospective customers that Vantage's "VIP" customer relationship management, or "CRM," service would be integrated with Optimal Blue's product and pricing engine.  Optimal Blue knew that Vantage was advising customers of this fact.  Indeed, Optimal Blue and Vantage even jointly drafted a communication announcing the integration to their respective customer bases and made a joint sales call to demonstrate the integrated system to Pulaski Bank in St. Louis, Missouri, a prospective Optimal Blue customer.   Vantage entered into thirteen new customer agreements, and currently has more than a dozen additional contracts, agreements, and proposals at various stages of negotiation with large mortgage lenders offering the integrated suite of CRM and PPE services.  Vantage is a market leader in the Integrated CRM-Mortgage market.

3.      Subsequently, and only after Vantage had locked in these contracts making it the market leader in the Integrated CRM-Mortgage market, Optimal Blue demanded -- for the first time -- that Vantage pay Optimal Blue a fee for permitting the integration.  Not only was the fee supracompetitive, it would also be financially crippling to Vantage because it would apply to all new and previously executed contracts.  Stated simply, Optimal Blue is using its market power in the PPE-Mortgage market to force Vantage (and soon others in the Integrated CRM Mortgage market) either to pay Optimal Blue's exorbitant and crippling fee or, in the alternative, leave the Integrated CRM-Mortgage market.  If the latter occurs (to Vantage and subsequently to others in the market), Optimal

**ORIGINAL COMPLAINT – Page 2**

*AUS 536328593v5*

Blue could move into that space and improperly acquire control of the Integrated CRM-Mortgage market.

4.     Optimal Blue's actions are a thinly veiled attempt to monopolize the Integrated CRM-Mortgage market.  It is using its market power in the PPE-Mortgage market to drive Vantage and others in the Integrated CRM Mortgage market out of business.  Once Optimal Blue has done that, it can then use its market power to manipulate and gain control of the Integrated CRM Mortgage market.  Optimal Blue's actions violate Section 2 of the Sherman Act, and so Vantage is left with no alternative other than to file this action seeking to enjoin Optimal Blue's actions and to obtain damages resulting from Optimal Blue's anticompetitive actions.

## II. <u>PARTIES</u>

### A.     <u>Plaintiff</u>

5.     Plaintiff Vantage is a Delaware limited liability corporation with its principal place of business in New Jersey. It is authorized to do business in Texas, and has done business in Texas with Defendant, Optimal Blue.

### B.     <u>Defendant</u>

6.     Defendant Optimal Blue is a Texas limited liability corporation with its principal place of business in Plano, Collin County, Texas.  It is authorized to do business and does do business in Texas.  It can be served with process in this matter by serving its registered agent, PICO-XP, L.L.C. at 800 E. Campbell Road, Suite 199, Richardson, Texas 75081.

**ORIGINAL COMPLAINT – Page 3**

*AUS 536328593v5*

### III.   JURISDICTION AND VENUE

7.     Vantage brings this action under 15 U.S.C. §§ 2 and 15.  In addition to damages, attorneys' fees and costs, Vantage seeks to enjoin Optimal Blue's conduct under 15 U.S.C. § 26.  This court has jurisdiction pursuant to 15 U.S.C. § 4 and 28 U.S.C. § 1331.

8.     Venue is proper in this court under 28 U.S.C. §1391 because Optimal Blue resides in this District and because a substantial part of the  anticompetitive actions giving rise to Vantage's complaint against Optimal Blue occurred in whole or in part in Plano, Texas.

### IV.   FACTUAL BACKGROUND

9.     Vantage is a leading innovator in providing CRM solutions to the mortgage industry.  CRM solutions are purchased for multiple business reasons; a primary one being the ability to eliminate unnecessary or redundant activities from the sales process, making loan officers more efficient and effective in selling mortgages.   While other CRM providers offer CRM solutions across multiple industries and business lines, Vantage is one of the few CRM providers that focuses solely on the mortgage industry.  Optimal Blue also focuses on the mortgage industry and provides a PPE that loan origination companies can purchase for multiple business purposes.  A key feature of Optimal Blue's product in the PPE-Mortgage market is the ability for a loan officer to efficiently and effectively pick mortgage products suitable for the prospective borrower.  These products include access to the secondary mortgage market, where loan originating companies can sell mortgages.

10.     Vantage and Optimal Blue have or target many of the same customers—large loan originators and lenders that have more than twenty loan officers. Historically, large loan originators allowed their loan officers to own their own prospect

**ORIGINAL COMPLAINT – Page 4**

*AUS 536328593v5*

and customer data and subjectively choose products to offer prospective borrowers based on information contained in rate sheets that specified available products and their associated rates.  This process was inefficient for the loan officer and exposed the lender to lower productivity in its sales force and a greater risk of regulatory noncompliance.  The financial crisis and the resulting reregulation of the mortgage industry demands that lenders and their loan officers become more efficient, more objectively determine the products offered to prospective borrowers, and ensure their marketing and sales activities are regulatory compliant.

11.     In addition to providing tools that make the marketing and sales efforts of the lender and its loan officers more effective, a key objective of the Vantage CRM is efficiency. The best way to do this is by eliminating unnecessary or duplicative tasks. In addition to providing access to the secondary market for the sale of its mortgages, the Optimal Blue PPE ensures the objective selection of mortgage products for presentation to the prospective borrower.  By integrating the two products, the user is able to access both with a single sign on to the Vantage CRM and avoid signing in and out if each product during the day.  Even more importantly, the loan officer does not need to constantly rekey information into one system that is already available in the other.  Instead the loan officer just exports the data from one to the other, and vice versa, making the loan officer's experience in using both services more efficient and user friendly, a win-win for the loan officer, the lender and both companies.

12.     Importantly, Optimal Blue does not offer the same products and services as Vantage.  Rather, they offer different products and services at different points in the mortgage loan process.

**ORIGINAL COMPLAINT – Page 5**

13.     Until recently, Optimal Blue allowed integration of its products and platform with CRMs like Vantage in the Integrated CRM-Mortgage market free of charge.

14.     Importantly, on information and belief, Optimal Blue has at least sixty percent (60%) of the market share of the PPE-Mortgage market.  Further, through its own hard work and the contracts that Vantage has obtained as described below, Vantage is a market leader in the Integrated CRM-Mortgage market.  Based upon contracts awarded in the Integrated CRM-Mortgage market, Vantage's market position exceeds 60% as well.

A.     **Vantage and Optimal Blue Begin Integrating Their Products**

15.     In or about May 2013, Vantage and Optimal Blue began discussing the integration of their separate products.  Vantage and Optimal Blue agreed that each side would bear its own costs in undertaking the project and that no fees would be exchanged. The integration was being performed for the benefit of their mutual customers to improve the users' experience in using both products.  Importantly, Vantage would not be selling any of Optimal Blue's products or services.  Rather, the integration would allow customers who use Vantage's portal to seamlessly have access to Optimal Blue's products and services as well.

16.     The integration itself results from Optimal Blue providing Vantage what is known as a software development kit ("SDK"), which provides the instructions for accessing and exchanging data with its product.  When complete, the integration allows a Vantage customer to be automatically and securely signed on to Optimal Blue's product and pricing engine from within the Vantage product, rather than requiring that the user exit the Vantage product and sign on the Optimal Blue product.  As described below, the end

**ORIGINAL COMPLAINT – Page 6**

*AUS 536328593v5*

users have already configured their own systems and trained their personnel to accept the data directly from Optimal Blue.

17.     To switch from Optimal Blue, the end user would have to evaluate competitive PPE products and then go through the installation of the new product, the conversion of all the related data, and the training of all its loan officers and secondary marketing personnel.  This is an arduous and expensive process.  Because of the costs to switch away from Optimal Blue, end users are locked in and not likely to switch providers.  Accordingly, while Vantage could integrate with a new PPE if need be, end users are unlikely to switch.  Vantage, other integrated mortgage CRM companies, and the end users, therefore, are at the mercy of Optimal Blue.

18.     In summer 2013, Vantage and Optimal Blue began the process of integrating their products.  On or about July 23, 2013, however, Kelli Hodges, Optimal Blue's Vice President of Operations ("Hodges"), informed Vantage that Larry Huff, Optimal Blue's co-CEO ("Huff"), was stopping the integration.  On or about July 31, 2013, Vantage responded to Optimal Blue's concerns and highlighted the number of potential customers desiring this integration, the vast majority being current Vantage and Optimal Blue customers who wanted to more efficiently take advantage of Optimal Blue's product as described above.  Per Optimal Blue's request, Vantage provided Optimal Blue with a list of potential customers, information that was proprietary to Vantage.

19.     On or about August 2, 2013, Hodges advised Vantage that she had been instructed by Huff to proceed with the integration project and to coordinate the work through Dawn Sherbyn, Optimal Blue's Product Manager ("Sherbyn").

**ORIGINAL COMPLAINT – Page 7**

*AUS 536328593v5*

20.     Throughout the rest of August 2013, Vantage worked with Sherbyn, demonstrating the functionality and value of Vantage's services and, again, sharing its proprietary list of prospective customers.  Through this exchange of information, Optimal Blue confirmed in its own mind how profitable teaming with or owning an integrated mortgage CRM company, especially one with significant market share, would be.  It also knew that Vantage was making commitments to end users about integration products that it could not fulfill without integration with Optimal Blue's products.

21.     On or about September 12, 2013, Vantage met with the Optimal Blue's integration team to begin the technical work on the integration project.  On September 19, 2013, Sherbyn provided Vantage with the credentials necessary to access Optimal Blue's system.

22.      From October through approximately December 2013, Vantage and Optimal Blue exchanged various communications about how to undertake the integration project.  By early 2014, the integration project was well underway and all necessary resources for integration were being applied.

23.     By April 2014, Optimal Blue requested demonstrations of Vantage's platform integrated with the Optimal Blue product and pricing engine for Optimal Blue's account managers, support, and sales team.  The demonstrations were successful.  Further, end users, i.e. customers of Vantage, were eager to work with Optimal Blue's products. This further demonstrated to Optimal Blue that it had achieved significant market power in the PPE-Mortgage market.  Further, Optimal Blue realized that, based upon its market power and network effects, it could leverage its power in the PPE-Mortgage market into the Integrated CRM-Mortgage market.

ORIGINAL COMPLAINT – Page 8

*AUS 536328593v5*

24.     On or about June 10, 2014, Vantage advised Sherbyn that it intended to release its updated software application with the Optimal Blue integration on July 15, 2014.  On or about June 23, 2014, Sherbyn advised Vantage that that the integration was being moved into Optimal Blue's production environment for final testing.  This new integration would allow Vantage to fulfill its contractual obligations with its customers and also entice new customers to contract with Vantage and, perhaps, Optimal Blue.

**B.**     **Vantage Executes Numerous Customer Contracts**

25.     In reliance on Optimal Blue's representations, both express and implied, as well as Optimal Blue's course of conduct in undertaking the development work to integrate the products, Vantage began marketing to its customers Vantage's CRM solution with the ability to integrate with Optimal Blue's PPE.  The marketing and sales efforts undertaken by Vantage were done with Optimal Blue's knowledge and understanding and, in some cases, with its active participation.  The marketing was well received.

26.     Based on its marketing efforts, Vantage entered into at least thirteen (13) contracts with different large loan originators, which expressly obligate Vantage to deliver its CRM product that was capable of integrating with Optimal Blue's PPE.  In addition, Vantage has about a dozen other contracts, agreements, and/or proposals at different stages of negotiation.  Not only did Vantage gain additional customers, it gained additional market share.  Given Vantage's success, Optimal Blue came to realize that it could not enter and control the Integrated CRM-Mortgage market with Vantage and others like it still in operation.  Rather, Optimal Blue would have to remove Vantage and others like it from the market and put a different integrated mortgage CRM in its place—an integrated mortgage CRM that was either owned by Optimal Blue or controlled by it.

**ORIGINAL COMPLAINT – Page 9**

**C.**   **Optimal Blue Demands Supracompetitive Fees in Order to Move into the Integrated CRM-Mortgage Market**

27.     In July 2014, *after* the integration was substantially complete and ready for final testing, *after* Vantage had actively marketed its CRM with integration with Optimal Blue, and *after* Vantage had executed binding contracts with its customers to deliver its CRM with integration with Optimal Blue, Optimal Blue demanded -- for the first time -- that Vantage pay Optimal Blue a substantial percentage of its entire revenue to integrate Optimal Blue's PPE.  Optimal Blue has indicated that it will have discussions with others in the Integrated CRM-Mortgage market in the future, once Vantage is either paying the supracompetitive fee or is out of the business.  On information and belief, Optimal Blue sought these fees in order to drive Vantage from the Integrated CRM-Mortgage market to gain control of Vantage's significant market share.

28.     Vantage was taken aback by Optimal Blue's shocking demand.  Optimal Blue knew, or reasonably should have known, that Vantage would not – and, indeed, could not – pay its king's ransom, as the demand reflected a materially significant portion of Vantage's entire profitability for all of its CRM assets and was grotesquely out of proportion to either the value of Optimal Blue's investment and/or risk.  Further, Optimal Blue's demand was contrary to its prior practice and out of line with the parties' prior discussions and interactions.  On information and belief, Optimal Blue demanded this fee to put Vantage into a precarious position and to send a message to the remaining Integrated CRM-Mortgage market participants.

29.     Vantage quickly attempted to work with Optimal Blue to reach a business solution so that their mutual customers would not be prejudiced.  Optimal Blue was not

**ORIGINAL COMPLAINT – Page 10**

interested.  Despite Vantage's best efforts, Optimal Blue was obstinate, and Vantage was unable to reach a resolution.

30.     Optimal Blue blocked all avenues for Vantage to connect with Optimal Blue's products and, on July 22, 2014, counsel for Optimal Blue sent a letter stating, "Optimal Blue is terminating any and all further negotiations and communications relating to Vantage and any proposed business relationship."

31.     As a result of Optimal Blue's actions, Vantage cannot deliver under the contracts that it has executed with its customers, which are now delayed and in jeopardy of being terminated.[1]  Not surprisingly, Optimal Blue and Vantage's joint customers have approached Vantage about why it is not delivering a CRM solution that integrates Optimal Blue's PPE.  Customers have stated that the contracts they executed were based on this integration, and some have already threatened termination and to hold Vantage in breach.

32.     If Optimal Blue is not stopped, Vantage cannot deliver its contractually obligated CRM product integrated with Optimal Blue's PPE product.  It will quickly lose customers, and therefore suffer damages as a result.  Vantage will also be subject to liabilities, and its reputation in the only market in which it operates will be significantly and materially damaged.

33.     Moreover, the unequal position in which Vantage now finds itself poses an actual risk to the company because of the dominant market position that Optimal Blue maintains and the fact that Optimal Blue has integrated its product with Vantage's major

---

[1] On August 1, 2014, Optimal Blue filed suit against Vantage in the 219th District Court, Collin County, Texas (the "State Court"), seeking a declaratory judgment and alleging that Vantage breached a non-disclosure agreement.  On August 11, 2014, the State Court entered a temporary restraining order against Optimal Blue, restoring limited access to the integration to Vantage, but this relief is temporary and limited and a hearing is set on August 25, 2014 for the State Court to determine whether it will enter a temporary injunction for the pendency of the state court lawsuit.

**ORIGINAL COMPLAINT – Page 11**

*AUS 536328593v5*

competitors, currently on dissimilar terms.  If Optimal Blue persists in trying to force Vantage to pay its monopoly rent, Optimal Blue can force Vantage from the market. Because of the switching costs, end users will not change from Vantage to a new PPE. Rather, customers will likely wait to contract with an integrated mortgage CRM that is propped up by Optimal Blue as a replacement.  This replacement will be subject to Optimal Blue's control, giving it monopoly power in both markets.

34.     On information and belief, Optimal Blue has not demanded fees from the other participants in the Integrated CRM-Mortgage market.  Optimal Blue has said that it will soon approach Vantage's competitors and demand a fee for offering integration with them as well.  Vantage is the lynchpin, however, because it is the market leader.  Once Vantage either capitulates or falls, Optimal Blue will have the ability to dominate the Integrated CRM-Mortgage market.

35.     Ultimately, Optimal Blue wants the ability to dominate the Integrated CRM-Mortgage market so that it can capitalize on its market power in the PPE-Mortgage market.  Acquiring market power in the Integrated CRM-Mortgage market will allow Optimal Blue to charge supracompetitive prices to customers reliant upon the integrated PPE and CRM markets.

**D.**     **Relevant Product and Geographic Markets**

36.     There are two relevant markets at issues in this matter.  First there is Optimal Blue's primary market, the PPE-Mortgage market.  As explained above, Optimal Blue facilitates the provision of information about mortgage terms, interest rates and other data.  On information and belief, Optimal Blue's customers include over six hundred lenders who have a substantial number of loan officers, which CRMs like Vantage would

**ORIGINAL COMPLAINT – Page 12**

*AUS 536328593v5*

define to be over twenty loan officers each.  Most small lenders do not typically rely upon integrated PPE and CRM services.

37.     In 2013, Optimal Blue had the largest revenues of all participants in the PPE-Mortgage market.   In 2013, it purchased the second largest participant in the PPE-Mortgage market, and the combined firm, on information and belief, then had revenues in excess of $30 million.  Also on information and belief, the third and fourth largest participants in the PPE-Mortgage market had combined revenues of approximately $15 to $18 million.  Based on this data, and based upon statements from Optimal Blue itself, Optimal Blue now has at least a 60% share of the PPE-Mortgage market.

38.     The second market at issue is the rapidly developing market for replacement CRM services offered by the Integrated CRM-Mortgage market.  Vantage is the market leader in the developing Integrated CRM-Mortgage market with the most robust solutions.  Vantage targets large lenders with twenty or more loan officers.  It does contract with smaller lenders.  Based upon recent contract awards involving the Integrated CRM-Mortgage market, Vantage's competitors have a much smaller market share. Indeed, in light of contracts awarded and other proposals and agreements, Vantage is the Integrated CRM-Mortgage market leader and has in excess of 60% of the Integrated CRM-Mortgage market.  It has over twenty-six total lenders with approximately 5,000 loan officers as part of its customer base, including some of the largest lenders in the United States.  If Optimal Blue is not stopped, it will use is monopoly power in the PPE-Mortgage market to improperly leverage into and control the rapidly developing Integrated CRM-Mortgage market.

**ORIGINAL COMPLAINT – Page 13**

*AUS 536328593v5*

39.    The geographic market for both the PPE-Mortgage market and the Integrated CRM-Mortgage market is the United States because both markets serve lenders and borrowers for residential mortgages on properties located in all fifty states.  Moreover, the lending relationships involved interstate commerce because the lenders are often located in different states than the borrowers.  The provision of integrated CRM and PPE services also involves interstate commerce because the PPE providers are in different states than the CRM providers.   Further, the data provided by a PPE through integration with a CRM comes from multiple sources, most of which involve information gathered from sources in at least two states.

**E.**    **Barriers to Entry**

40.    Because the mortgage industry has changed as a result of the 2008 market crash and resulting regulations, lenders are demanding an integrated suite of products that cover the spectrum of services.  In the PPE-Mortgage market, for example, Optimal Blue offers a PPE product that covers the types of services that most large lenders require in pricing and identifying suitable loan packages for customers.  Optimal Blue is now the market leader with the largest market share by far.  As a result, the market has tipped in favor of Optimal Blue's technology.  As explained above, lenders are unlikely to switch from Optimal Blue because of the switching costs.

41.    While a new PPE could enter the market, it would face an uphill battle to gain any market share in the PPE-Mortgage market.  Lenders would have to agree to switch away from Optimal Blue's interfaces and technology, which would require the creation of new platforms and the writing of new codes and programs.  On information and belief, the switching costs are extreme and therefore cost prohibitive. Lenders are not going to invest

**ORIGINAL COMPLAINT – Page 14**

the necessary capital needed for these extreme start-up costs.  Further, the mortgage market itself is consolidating, decreasing the number of new lenders, and the switching costs of converting are higher.  These dynamics make it difficult for other vendors to steal Optimal Blue's customers and create a disincentive for anyone developing a new PPE to compete with Optimal Blue.  As a result, Optimal Blue will remain the PPE of choice.

42.    Vantage and its customers are prime examples of Optimal Blue's network effects.  Vantage has modified its system so that it can fully integrate with Optimal Blue's PPE and has contracted with end users based upon this integration.  Vantage's customers expect it to provide access to Optimal Blue's interface and deliverables.  Because of its contracts and its customers who are unwilling to switch PPEs based upon the switching costs, Vantage is unable to switch to one of the lesser PPEs.  Consequently, Optimal Blue enjoys its substantial market power in the PPE-Mortgage market.

**F.    Anticompetitive Actions and Impact on the Relevant Markets**

43.    Optimal Blue's sudden assessment of an unreasonable, and ultimately punitive, fee is specifically designed to have a significant anticompetitive effect on the Integrated CRM-Mortgage market.  Faced with Optimal Blue's demand, Vantage has two choices: capitulate, pay the fee and not raise its prices to its customers, which will cause Vantage to go out of business, or not pay the fee and lose the ability to integrate with Optimal Blue's products, causing its customers to select other integrated mortgage CRM products from companies not paying the supracompetitive fee, which will cause Vantage to go out of business.

44.    If participants like Vantage in the Integrated CRM-Mortgage market agree to the fee and raise prices, then the customers will suffer immediate negative effects

**ORIGINAL COMPLAINT – Page 15**

because their prices will increase.  The customers will then have to either absorb the fee increase, which will negatively impact their profits, or they will have to pass along the higher fees to the borrowers—those actually engaging in the mortgage transaction.

45.     If Vantage agrees to the supracompetitive fee and does not pass along the excess costs, then it will surely go out of business.  The formula Optimal Blue is using to calculate its fee is excessive and oppressive and specifically designed to do as much damage to Vantage as possible.   The fee is based upon a substantial percentage of Vantage's overall revenue, without reference to profit or costs and without reference to the revenue actually associated with the use of or access Optimal Blue's products and services. In the Integrated CRM-Mortgage market, Optimal Blue cannot charge its supracompetitive fees.  Indeed, with regard to Vantage, a fee based upon the amounts demanded by Optimal Blue will devour nearly all of Vantage's gross margin.  Vantage would be out of business quickly in such a scenario, and Optimal Blue knows this.

46.     If Vantage goes out of business, then its customers will need to search for a CRM to replace Vantage.  This new CRM will likely have to utilize Optimal Blue's platform because the lenders' platforms are already configured to interface with Optimal Blue's platform and technology.  The lenders will be dependent upon Optimal Blue to provide a new CRM.

47.     Should Vantage simply choose to not pay the supracompetitive fee demanded by Optimal Blue, it will lose, and already has lost, access to Optimal Blue's platform.  As discussed above, Optimal Blue is the market leader in the PPE-Mortgage market and enjoys significant network effects with its 60% plus market share.  Vantage would have to find a PPE that offered similar benefits of Optimal Blue, and would then

**ORIGINAL COMPLAINT – Page 16**

*AUS 536328593v5*

have to convince its customers to invest in a revamping of their platforms in order to access the new PPE's platform and interface.   Moreover, these actions would need to be completed immediately, which is an impossible task.  Optimal Blue knows that the lenders who are Vantage's customers will not make the switch and indeed cannot do so on such a short timeline.  Accordingly, the lenders will be dependent upon Optimal Blue to provide a new CRM.

48.     Optimal Blue is completely aware of the effect of its supracompetitive fee. It specifically designed this fee to harm Vantage and drive it from the Integrated CRM-Mortgage market.  Optimal Blue's actions evidence its specific intent to leverage its market power in the PPE-Mortgage market into the Integrated CRM-Mortgage market and attempt to monopolize that market.  It has used its market power in the PPE-Mortgage market to design a Hobson's Choice for Vantage for the specific purpose of driving Vantage from the Integrated CRM-Mortgage market.  With Vantage driven from the Integrated CRM-Mortgage market, Optimal Blue can then leverage its market power in the PPE-Mortgage market to gain market power in the Integrated CRM-Mortgage market.

49.     Given the barriers to entry in the PPE-Mortgage market and Integrated CRM-Mortgage market, Optimal Blue has a dangerous probability of success of monopolizing the Integrated CRM-Mortgage market.  The barriers to entry detailed above prevent others from entering the market and policing Optimal Blue's actions.   Optimal Blue, if left unchecked, will attain monopoly power in the Integrated CRM-Mortgage market based upon its anticompetitive practices.

50.     Optimal Blue will be able to control which CRMs have access to its platform.  It can then control who enters the market and who can provide services to the

**ORIGINAL COMPLAINT – Page 17**

lenders.  It can force the lenders to wait until it either acquires a CRM to provide integrated mortgage CRM services or until it develops its own CRM.  In either case, Optimal Blue will have leveraged its market power in one market into generating market power in a separate and distinct market.

## V.   CAUSE OF ACTION

### MONOPOLY LEVERAGING
### UNDER SECTION 2 OF THE SHERMAN ACT

51.     Plaintiff repeats and realleges paragraphs 1 through 50 as if fully set forth herein

52.     Optimal Blue designed the supracompetitive and anticompetitive fee structure for the specific purpose of driving Vantage from the Integrated CRM-Mortgage market.  As part of its plan, it intended to use its 60% market share in the PPE-Mortgage market to leverage into and gain the entirety of Vantage's market share, in excess of 60% as described above, in the Integrated CRM-Mortgage market.

53.     Vantage is the largest CRM in the Integrated CRM-Mortgage market, so if Optimal Blue could acquire through any means the customer base of Vantage, it would gain a monopoly power in the Integrated CRM-Mortgage market.   Specifically, once Optimal Blue drives Vantage from the Integrated CRM-Mortgage market, as designed, Optimal Blue will have access to over 50% of the Integrated CRM-Mortgage market, which it will quickly grow because of the network effects it already enjoys.  Optimal Blue knows it will acquire this market share because the switching costs required to move to a different PPE-Mortgage provider are too high for lenders to pay.  Instead, they will work with the CRM that Optimal Blue sponsors, even if that CRM is owned by or controlled by Optimal Blue.

**ORIGINAL COMPLAINT – Page 18**

54.     Optimal Blue's attempt to monopolize the Integrated CRM-Mortgage market through the leveraging of its monopoly in the PPE-Mortgage market has a reasonable and likely chance of success given the barriers to entry that its own network effects have created. New entrants to compete against Optimal Blue are unlikely due to the high switching costs and time and resources needed to develop a new competitive platform. Lenders are not willing to spend the time or the money. Instead, they will be forced to deal with Optimal Blue and its supracompetitive prices in both the PPE-Mortgage market and the Integrated CRM-Mortgage market.

55.     Optimal Blue's anticompetitive actions therefore are specifically tailored to gain control of the Integrated CRM-Mortgage market. Once Vantage and others like it are driven from the market, Optimal Blue can then use its network effects and market power in the PPE-Mortgage market to gain market power in the Integrated CRM-Mortgage market to the detriment of lenders and borrowers.

## VI.   INJUNCTION

56.     Plaintiff repeats and realleges paragraphs 1 through 55 as if fully set forth herein

57.     Under 15 U.S.C. §26, Vantage is entitled to an injunction that prevents Optimal Blue from continuing with its anticompetitive conduct, which includes its attempt to assess a supracompetitive fee for its PPE services.

58.     But for Optimal Blue's supracompetitive fees, Vantage could continue to operate in the Integrated CRM-Mortgage market and service its current client base. An injunction is necessary to preserve the current state of competition in the Integrated

**ORIGINAL COMPLAINT – Page 19**

*AUS 536328593v5*

CRM-Mortgage market and protect the interests of entities like Vantage's customers as well as borrowers seeking residential mortgages.

59.     Vantage can establish that an injunction is necessary and that all conditions precedent for the entry of an injunction against Optimal Blue have occurred or can be fulfilled.

## VII.     ATTORNEYS' FEES

60.     Plaintiff repeats and realleges paragraphs 1 through 59 as if fully set forth herein.

61.     Under 15 U.S.C. §15(a), a plaintiff who succeeds on its claims under Sections 1 or 2 of the Sherman Act is entitled to an award of its reasonable and necessary attorneys' fees and costs.

62.     Upon entry of judgment in this cause in Vantage's favor, it asks for an award of its reasonable and necessary attorneys' fees and costs incurred in prosecuting this suit.

## VIII.     DAMAGES

63.     Plaintiff repeats and realleges paragraphs 1 through 62 as if fully set forth herein.

64.     Vantage has and will continue to suffer damages to its revenue stream as a result of Optimal Blue's anticompetitive conduct.  Vantage may also soon lose customers, which means that it will lose additional revenue and profits.  To the extent Optimal Blue is allowed to continue its anticompetitive conduct, Vantage may go out of business.  It would be entitled to damages for future profits that it would have earned but for Optimal Blue's anticompetitive conduct that improperly drove it out of business.

ORIGINAL COMPLAINT – Page 20

*AUS 536328593v5*

65.     Further, under 15 U.S.C. §15(a), Vantage is entitled to treble damages for Optimal Blue's anticompetitive actions in violation of Section 2 of the Sherman Act.

## IX.   JURY DEMAND

66.     Vantage Production, L.L.C. requests a trial by jury on all issues relating to this Complaint.

## X.     RELIEF REQUESTED

WHEREFORE, Vantage Production, L.L.C. requests that this Court grant judgment as follows:

(a)     Judgment in favor of Vantage Production, L.L.C. and against Defendant on Vantage Production, L.L.C.'s causes of action for violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(b)     An award in favor of Vantage Production, L.L.C. and against Defendant, for actual damages in an amount not less than $5,000,000.00;

(c)     An award of  treble damages;

(d)     An award of pre- and post-judgment interest, costs, and expenses;

(e)     An award of its reasonable and necessary attorneys' fees incurred as a result of prosecuting this case to a successful conclusion; and,

(f)     All other relief the Court deems equitable and just.

Respectfully submitted,

GREENBERG TRAURIG, LLP


By:  */s/ Gregory J. Casas*
          Gregory J. Casas
          State Bar No. 00787213
          casasg@gtlaw.com
          300 West 6th Street, Suite 2050
          Austin, Texas 78701
          Telephone: (512) 320-7200
          Telecopier: (512) 320-7210

**ATTORNEYS FOR PLAINTIFF
VANTAGE PRODUCTION, L.L.C.**


OF COUNSEL:

GREENBERG TRAURIG, LLP

Christopher M. LaVigne
State Bar No. 24026984
E-mail:  lavignec@gtlaw.com
P. William Stark
State Bar No. 24046902
E-mail:  starkb@gtlaw.com
2200 Ross Ave., Suite 5200
Dallas, Texas 75201
Telephone: (214) 665-3600
Facsimile: (214) 665-3601


Paul J. Brown
State Bar No. 24006913
E-mail: brownpa@gtlaw.com
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 374-3500
Facsimile: (713) 374-3510

**ATTORNEYS FOR PLAINTIFF VANTAGE PRODUCTION, L.L.C.**


**ORIGINAL COMPLAINT – Page 22**

*AUS 536328593v5*